Page 1

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE SOUTHERN DISTRICT OF TEXAS
MC ALLEN DIVISION

GABRIEL MIRANDA, SR., and        )
MARIA FUENTES, Individually      )
and as Representative of the     )
Estate of GABRIEL MIRANDA,       )
JR.,                             )
                                 )
          Plaintiffs,            )
                                 ) Civil Action No.
     -vs-                        ) 7:18-cv-00353
                                 )
NAVISTAR, INC., NAVISTAR         )
INTERNATIONAL CORPORATION, IC    )
BUS, LLC, and IC BUS OF          )
OKLAHOMA, LLC,                   )
                                 )
          Defendants.            )


          The deposition of JOSEPH LABONTE, called

for examination pursuant to subpoena and the Rules

of Civil Procedure for the United States District

Courts pertaining to the taking of depositions,

taken before Allison D. Weber, Certified Shorthand

Reporter, a notary public within and for the County

of Cook and State of Illinois, at 150 North

Michigan Avenue, 28th Floor, Chicago, Illinois, on

January 29, 2020, at the hour of 9:57 o'clock a.m.


Reported by:  Allison D. Weber, CSR
License No.:  084-002238

Thompson Court Reporters, Inc
thompsonreporters.com

**EXHIBIT A**

```
                                                    Page 2
 1    APPEARANCES:

 2

 3    TURLEY LAW FIRM
      BY:  MR. WINDLE TURLEY
 4    1000 Turley Law Center
      6440 North Central Expressway
 5    Dallas, Texas  75206
      (214) 691-4025
 6    win@wturley.com
           Appearing on behalf of the Plaintiffs;
 7

 8

      TURLEY LAW FIRM
 9    BY:  MS. T NGUYEN
      1000 Turley Law Center
10    6440 North Central Expressway
      Dallas, Texas  75206
11    (214) 691-4025
      TN@wturley.com
12         Appearing on behalf of the Plaintiffs;

13

14    SHEEHY WARE PAPPAS
      BY:  MR. WILLIAM J. COLLINS, III
15    909 Fannin Street, Suite 2500
      Houston, Texas  77010
16    (713) 951-4603
      wcollins@sheehyware.com
17         Appearing on behalf of the Defendants.

18

19

20

21

22

23

24
```

EXHIBIT A

Page 3

```
 1                    I N D E X

 2  WITNESS                              PAGE

 3  JOSEPH LABONTE

 4   Examination by Ms. Nguyen              4

 5

 6

 7              E X H I B I T S

 8  NUMBER                       MARKED FOR ID

 9  Exhibit

10   Exhibit 1                            5
     Exhibit 2                           72
11   Exhibit 3                          144
     Exhibit 4                          157
12   Exhibit 5                          167
     Exhibit 6                          168
13   Exhibit 7                          173
     Exhibit 8                          174
14   Exhibit 9                          175
     Exhibit 10                         176
15   Exhibit 11                         177
     Exhibit 12                         177
16   Exhibit 13                         182
     Exhibit 14                         184
17   Exhibit 15                         189
     Exhibit 16                         202
18   Exhibit 17                         205
     Exhibit 18                         208
19   Exhibit 19                         211
     Exhibit 20                         214
20   Exhibit 21                         228
     Exhibit 22                         230
21   Exhibit 23                         240
     Exhibit 24                         249
22   Exhibit 25                         254

23

24
```

Thompson Court Reporters, Inc
thompsonreporters.com

EXHIBIT A

Page 4

1          (Witness sworn.)

2                    JOSEPH LABONTE,

3     called as a witness herein, having been first duly

4     sworn, was examined and testified as follows:

5                    EXAMINATION

6     BY MS. NGUYEN:

7          Q.    Would you please state your full name for

8     the record.

9          A.    Joseph Labonte.

10         Q.    Mr. Labonte, my name is T Nguyen and this

11    is Windle Turley, and we represent the family of

12    Gabriel Miranda, Junior in this lawsuit.  Do you

13    understand who I am and who I represent?

14         A.    I do.

15         Q.    And you're here today, I understand, as a

16    corporate representative of Navistar, Inc.;

17    Navistar International Corp.; IC Bus, LLC; IC Bus

18    of Oklahoma, LLC; is that correct?

19         A.    That's correct.

20         Q.    These entities, from your understanding,

21    are the four named defendants in this case?

22         A.    Yes.

23

24

EXHIBIT A

Page 100

1  BY MS. NGUYEN:

2      Q.   When you say do not stop, what is that?

3      A.   Do not block.  Sorry.

4      Q.   Do not block the rear emergency exit

5  door?

6      A.   Correct.

7      Q.   Is there a do not touch the rear

8  emergency exit door when there's no emergency?

9      A.   No.

10     Q.   So as far as you know, Mr. Labonte, from

11  1975 to 2004 to today, I guess, there have been no

12  changes in the design criteria for the latching

13  mechanism of the rear emergency exit door, correct?

14     A.   Not that I'm aware of.

15     Q.   As you sit here today, does Navistar have

16  any plans to discontinue or change the CE school

17  bus platform with the exception of improvements, of

18  course?

19     A.   Like I said earlier, I'm not sure what

20  platform it is.  We talked that it is not like a

21  passenger car manufacturer has platforms in various

22  models on the same basis and assemblies.

23     Q.   But as you sit here today, there's no

24  plan for Navistar to discontinue the CE school bus

EXHIBIT A

1  models, correct?

2      A.   That's correct, we are not discontinuing

3  a good product.

4      Q.   You agree with me that in the CE school

5  bus there's no option for a lockable rear emergency

6  exit door while the bus is in motion?

7      A.   That's correct.  It's not allowed by

8  FMVSS 217.

9      Q.   And are you saying that that decision to

10 not provide an option for a lockable rear emergency

11 exit door, the reason for that is specifically

12 FMVSS 217?

13          MR. COLLINS:  Objection.  Form.

14          THE WITNESS:  That's our interpretation.

15     That's correct.

16 BY MS. NGUYEN:

17     Q.   And that is strictly the only reason why

18 Navistar has not provided a lockable rear emergency

19 exit door while the bus is in motion because of

20 that Rule 217?

21     A.   No, that's not the only reason.

22     Q.   What's the other reason?

23     A.   We believe it would be hazardous.

24     Q.   And what testing or what research have

EXHIBIT A

Page 102

1   you done to show that it was hazardous?

2        A.   Not research, but our, you know,

3   scenarios, consideration of what can happen to a

4   school bus and actual events that have happened to

5   a school bus that if the door had been locked while

6   the vehicle was in motion or wheels turning, that

7   would have created and could have created a much

8   greater hazard and death of pupils.

9        Q.   What department did that scenario

10  analysis?

11       A.   There's been no formal report.  It's only

12  been a discussion.

13       Q.   And that's a discussion after this

14  lawsuit and after the Hale lawsuit; is that

15  correct?

16       A.   Yes.

17       Q.   And that informal discussion was

18  basically in your defense of a Navistar and IC bus,

19  correct?

20            MR. COLLINS:  Objection.  Form.

21            THE WITNESS:  I wouldn't say in defense,

22       but to consider if that's even viable.

23  BY MS. NGUYEN:

24       Q.   Well, basically, I mean, you were brought

**EXHIBIT A**

Page 103

1  in to investigate the Hale case and this Miranda

2  case, and you represent Navistar in its defense,

3  correct?

4       A.   Yes.

5       Q.   And so in looking at these different

6  scenarios, would you tell me that you did any of

7  this analysis prior and without these two lawsuits

8  filed already against Navistar?  You wouldn't have

9  done that, right?

10            MR. COLLINS:  Objection.  Form.

11            THE WITNESS:  I don't know if it would

12        not have been done, but certainly the

13        awareness through these two lawsuits made us

14        consider.

15  BY MS. NGUYEN:

16       Q.   And so who all was involved in doing the

17  scenario analysis, you?

18       A.   Myself.  I'm not sure about others

19  specifically having formal meetings at all on it.

20       Q.   It's just you?

21       A.   Not just myself, but other design

22  engineers or those that might need to work with the

23  emergency exit door in general.  I can't speak

24  specifically.

EXHIBIT A

Page 104

1      Q.    And who did you have these conversations

2    with specifically?

3      A.    I don't recall.  General.  Because it's

4    such an element of you would not want to have the

5    door locked while the wheels are moving -- while

6    the engine is running.

7      Q.    So, Mr. Labonte, what's your experience

8    in regards to crashworthiness of buses in specific

9    to the rear emergency exit door?

10     A.    Well, I have been involved with the NTSB

11   and crash investigations and fires.

12     Q.    Specifically with the rear emergency exit

13   door with the exception of the Hale and the Miranda

14   case, what else?

15     A.    One was a fire of a school bus where the

16   wheels were -- the driver backed over a ditch and

17   the driver continued to spin the tires and the bus

18   caught on fire and he kept panicking to spin the

19   wheels to try and get it out, and the bus was fully

20   engulfed.  In our assessment, the emergency exits

21   all functioned.

22     Q.    Was he the only one on the bus?

23     A.    No, there was one other child.

24     Q.    And did someone perish?

EXHIBIT A

Page 105

1      A.   Both perished.

2      Q.   Did -- do you know if the exit doors had

3   been -- any attempts to push open the exit doors?

4      A.   Not the emergency exit doors or exit

5   windows.

6      Q.   So basically in that particular scenario

7   you were looking to see if the emergency exit doors

8   were functioning?

9      A.   That's correct, among fire investigation,

10  yes.

11     Q.   So what does that have to do with an

12  emergency exit door being locked while in motion?

13     A.   Since the wheels were spinning, then that

14  would mean that the -- if there was some way of

15  sensing the vehicle moving through its wheels,

16  then -- and the emergency exits were locked, then

17  they could not be used in that scenario.

18     Q.   In your engineering background, is wheel

19  spinning the only way that a switch can be

20  programmed to show that a vehicle was actually in

21  motion?

22     A.   I don't know.

23     Q.   So as you sit here today, you don't know

24  what the criteria for the rules to make a switch to

EXHIBIT A

Page 111

1   and you say, okay, these all go with it and here

2   are the extra options, which extra options you

3   want, right?  I mean, they're paying for it.

4        A.   No.

5             MR. COLLINS:  Wait.  Objection.  Form.

6                  Let me get my objection in, please.

7             THE WITNESS:  Okay.

8   BY MS. NGUYEN:

9        Q.   As you sit here today --

10            MR. TURLEY:  Somebody has to object.

11        When he says object to form, somebody has to

12        say what is it.  You have to do it, or I have

13        to do it.

14            MR. COLLINS:  You can't do it, Windle.

15        One lawyer.

16            MR. TURLEY:  I know.

17            MS. NGUYEN:  Can we get off the record

18        for just a moment?

19                  (A short break was taken.)

20            MS. NGUYEN:  We're back on the record.

21   BY MS. NGUYEN:

22        Q.   Mr. Labonte, before we left for the

23   break, you mentioned one scenario that in your

24   informal analysis you say would be more -- would be

EXHIBIT A

Page 112

1   a hazard if we had a lockable rear emergency exit

2   door when the bus is in motion, was if a bus tipped

3   over and the wheels kept spinning; is that correct?

4       A.   That was not specifically the example I

5   gave you.  I was talking about a vehicle that was

6   stuck in a ditch and still upright, but the wheels

7   were spinning in dirt.

8            But there are other scenarios, like

9   you say with a bus that would roll over and the

10  wheels spinning or even a bus sliding down a hill

11  and continuing to slide.

12           Wheels spinning and bus moving

13  where -- depending on -- the bus going into a lake

14  could be a hazard if kids could not use an

15  emergency exit because it was locked.

16      Q.   Now, in regards to the -- are there any

17  other scenarios that you can think of that would

18  make this situation more hazardous if there were a

19  lockable rear emergency exit door when the bus is

20  in motion?

21      A.   Well, one -- another scenario that we

22  often use in many different considerations is a bus

23  on a railroad track.

24           There's railroad tracks that have

EXHIBIT A

Page 113

1   great humps that you have to go over and the bus

2   could get caught mid-span with the wheels spinning

3   and on the railroad tracks and a train coming.

4        Q.    Okay.  Any other scenarios?

5        A.    A bus that has a fire, a fire can occur

6   at any time with the electrical source and the

7   engine on or not.  Electrical causes fires.

8              So using electrical signals or

9   something could be compromised and have an issue

10  and the scenarios of a bus rolling down and

11  approaching a cliff had often been thrown around as

12  different terrible bus scenarios.

13       Q.    Any other scenarios?

14       A.    I can't mention any right now.

15       Q.    Okay.  So let's go through the first one.

16  School bus is still upright and the wheels are

17  spinning in the mud, but it's not going anywhere.

18              You're saying that's more dangerous

19  because you're saying that the door would still be

20  locked?

21       A.    In that particular scenario, this

22  actually happened and the bus caught fire, and had

23  the bus been filled with children and the service

24  door, the entry door was compromised, if the

EXHIBIT A

Page 114

1  emergency exit doors or exits were locked, they

2  would be trapped in this fire.

3      Q.   Is there such a thing as an override

4  button to unlock the emergency exit doors?  Is

5  there such a technology?

6      A.   In order to unlock the door, you have to

7  go to the rear emergency exit door and move a bolt.

8      Q.   But I'm saying in this scenario to

9  engineer a lockable rear emergency exit door while

10 the bus is moving, could an override button be put

11 in place where you just push a button, everything

12 is unlocked?  Is that possible?

13     A.   Not according to FMVSS 21 that no tools

14 or remote -- without the use of power or the loss

15 of power is it possible to have a lockable --

16          MS. NGUYEN:  Objection.  Nonresponsive.

17 BY MS. NGUYEN:

18     Q.   I'm not talking about standard.  I'm

19 talking about engineering.  Okay.  Forget the

20 standard.

21          Is it possible to have technology in

22 place back in 2010 where you could have an override

23 if this were in place and if there were no

24 Standard 217, that there could be an override

EXHIBIT A

Page 267

1  STATE OF ILLINOIS    )

2                       )  SS:

3  COUNTY OF C O O K    )

4

5          I, Allison D. Weber, Certified Shorthand

6  Reporter, a notary public within and for the County

7  of Cook and State of Illinois, do hereby certify

8  that heretofore, to-wit, on January 29, 2020,

9  personally appeared before me, at 150 North

10  Michigan Avenue, 28th Floor, Chicago, Illinois,

11  JOSEPH LABONTE, in a cause now pending and

12  undetermined in the District Court for the Southern

13  District of Texas, McAllen Division, wherein

14  GABRIEL MIRANDA, SR., AND MARIA FUENTES,

15  INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF

16  GABRIEL MIRANDA, JR., are the Plaintiffs, and

17  NAVISTAR, INC., NAVISTAR INTERNATIONAL CORPORATION,

18  IC BUS, LLC, AND IC BUS OF OKLAHOMA, LLC, are the

19  Defendants.

20          I further certify that the said witness

21  was first duly sworn to testify the truth, the

22  whole truth and nothing but the truth in the cause

23  aforesaid; that the testimony then given by said

24  witness was reported stenographically by me in the

Thompson Court Reporters, Inc
thompsonreporters.com

EXHIBIT A

Page 268

1    presence of the said witness, and afterwards

2    reduced to typewriting by Computer-Aided

3    Transcription, and the foregoing is a true and

4    correct transcript of the testimony so given by

5    said witness as aforesaid.

6            I further certify that the signature to

7    the foregoing deposition was reserved by counsel

8    for the respective parties.

9            I further certify that the taking of this

10   deposition was pursuant to notice, and that there

11   were present at the deposition the attorneys

12   hereinbefore mentioned.

13           I further certify that I am not counsel

14   for nor in any way related to the parties to this

15   suit, nor am I in any way interested in the outcome

16   thereof.

17           IN TESTIMONY WHEREOF:  I have hereunto set

18   my hand and affixed my notarial seal this 10th day

19   of February 2020.

20

21                    _Allison D. Weber_

22                    _____

23           NOTARY PUBLIC, COOK COUNTY, ILLINOIS

24

EXHIBIT A