**IN THE UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF TEXAS**

**MCALLEN DIVISION**

| | | |
|---|---|---|
| ESTATE OF GABRIEL MIRANDA, JR., | § | |
| MARIA FUENTES, GABRIEL MIRANDA, | § | |
| SR., ALEXANDRIA SUZANNE DELEON, | § | |
| REUBEN ANTONIO DELEON III, AND | § | |
| JON HIDALGO DOE, INDIVIDUALLY | § | |
| SIMILARLY SITUATED PLAINTIFFS | § | |
| | § | CIVIL ACTION NO. 7:18-CV-00353 |
| v. | § | |
| | § | |
| NAVISTAR, INC., NAVISTAR | § | |
| INTERNATIONAL CORPORATION, | § | |
| IC BUS, LLC, AND IC BUS OF | § | |
| OKLAHOMA, LLC | § | |

---

## DECLARATION OF CHRISTOPHER J. BONANTI

---

I, Christopher J. Bonanti, do herby certify and affirm the following:

1.    My name is CHRISTOPHER J. BONANTI. I am over the age of eighteen years, of sound mind and capable of making this affidavit.  The following statements are made on the basis of my own personal knowledge and the facts stated herein are true and correct.

2.    Attached to this affidavit is a true and correct copy of my curriculum vitae. This affidavit provides an overview of why my academic background, coupled with my professional work experience, qualifies me to provide expert opinions regarding the regulatory and compliance areas addressed in the paragraphs below of the subject case.

3.    My academic credentials include a Bachelor of Science, a Master of Engineering and a Master of Business Administration.  In addition, I have completed all course work and advanced to candidacy for a PhD in Environmental Science and Public Policy with a focus on the transference of risk during the regulatory process.  The course work for my PhD which directly relates to the plaintiff's compliant includes: Public Policy, Economics of regulation, International Policy, and Macroeconomic Theory.  With regards to engineering coursework, I have completed the following classes that also directly relates to the plaintiff's complaint: Newtonian Mechanics I&II (engineering statics & dynamics), Physics I&II, Strength and Materials, Applied Thermodynamics, and Fluid Dynamics. This is by no means a comprehensive list of all the science, engineering and public policy classes I have completed, but provides a general foundational background to help demonstrate why I am capable of understanding the basic physics and policy related issues associated with this accident.

1

**EXHIBIT B**

4.   Further, as a former General Engineer/Investigator-in-Charge at the National Transportation Safety Board (NTSB), I was trained and completed numerous courses dealing with accident investigations.  These courses included investigating motor vehicle, railroad, aviation and pipeline accidents.  I was an accident investigator with the NTSB for seven years.

5.   My opinions in this case are based on my academic and 25+ years of work experience leading and managing regulatory, legislative, compliance and infrastructure projects for all modes of transportation, including commercial vehicles and buses. I was a member of the U.S. Senior Executive Service, as well as, the Associate Administrator for Rulemaking at the National Highway Traffic Safety Administration (NHTSA). At NHTSA, I was the senior executive responsible for developing, writing and implementing rules, regulations, and standards for all ground transportation vehicles sold within the U.S., including motor vehicles, commercial vehicles, school buses, motor coaches, emergency vehicles, and the motorcycle industry. These regulations included all Federal Motor Vehicle Safety Standards (FMVSS).

6.   As a former federal investigator for transportation accidents while at the NTSB where I evaluated whether commercial vehicles were in compliance with regulations required by FMVSSs.  I have gained significant experience with the federal regulatory, compliance and oversight process throughout my career.  I have reviewed, provided technical and compliance oversight, and served as a decision maker on more than 1,000 federal regulatory or compliance investigations.

7.   The NHTSA is charged by the U.S. Congress through its authorizing legislation to save lives on America's roadways, prevent injuries that are sustained by occupants in motor vehicles, as well as, vulnerable road users to reduce the number of motor vehicle crashes. To complete its' mission, the agency utilizes several safety, regulatory, enforcement (defect investigations and recalls), and behavioral mechanisms.

8.   In an effort to improve vehicle safety, the agency established the FMVSS, which fulfills its legislative mandate under Title 49 of the United States Code, Chapter 301, for Motor Vehicle Safety.  FMVSSs are regulations that must be complied with by original manufacturers of motor vehicles (OEM) and manufacturers that produce equipment items that are specifically spelled out in the regulations. OEMs must conform and certify compliance with each of the FMVSSs that correspond to the type of vehicle or equipment they manufacture.

9.   My work with FMVSSs and regulations included the technical, engineering, regulatory evaluation and cost-benefit areas that are required to be included as part of these regulatory initiatives.  I was responsible for all technical, engineering, and crash testing criteria associated with the establishment of both crash worthiness and crash avoidance regulations, standards and guidelines developed at NHTSA.  These crash worthiness regulations and FMVSSs establish the performance criteria that must be met by an OEMs to ensure they comply with the regulation.

2

**EXHIBIT B**

**First Category of Opinions: NHTSA Rulemaking**

10. NHTSA's decision to resolve a vehicle safety issue is initiated when (1) available data or research shows a trend that is significant and action by the agency has the ability to save significant lives, (2) a Congressional mandate has been signed into law by the President, (3) there is a Presidential initiative, or (4) it becomes either a Secretarial or Administrator priority. Although the agency may receive a petition for rulemaking, if the vehicle accident and injury data does not support the recommended course of action, the petition may not be granted or NHTSA may simply initiate research on the matter.

11. When NHTSA issues a rulemaking that is required to be complied with by vehicle manufactures, the agency is required to publish: (1) a NPRM first (after which the public and industry are allowed to provide comments on the proposal) and (2) a Final Rule, which establishes when the proposed regulation will become effective and identifies what new requirements must be met. This rulemaking process generally takes several years for an initiative that would be classified by the President of the United States' Office of Management and Budget (OMB) as a "significant" rule. However, if a rulemaking initiative is designated by OMB as "nonsignificant," the entire rulemaking process may take just a couple or few years. The OMB is the deciding factor in determining which rulemaking initiatives are deemed significant or nonsignificant. The Office of the President has a major role in determining if a significant rule can even be published as an NPRM or Final Rule. The terms "significant" and "nonsignificant" are defined in Executive Order 12866.

12. According to Executive Order 12866 – Regulatory Planning and Review, a "significant regulatory action" is defined as having "an annual effect on the economy of $100 million or more or adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or state, local, or tribal governments or communities." Furthermore, the executive order also requires every federal agency to not initiate a rulemaking action if the agency's proposal is not cost beneficial.

13. In 2011 while the Associate Administrator for Rulemaking, I had several regulatory initiatives and interpretations that I considered and made decisions on regarding school buses. As a result, I am intimately knowledgeable about the FMVSSs that affect the vehicle involved with this litigation. Further, in 2012 while I was the Associate Administrator, I made changes to FMVSS 217 regarding the exterior release (the exterior handle) for school buses rear emergency exit door. I also clarified the standard regarding the force application required to open windows and roof emergency exits.

14. NHTSA must meet its statutory authority requirements when initiating a proposed regulation. The agency must consider: (1) the need for motor vehicle safety, (2) a performance standard, (3) objectiveness, (4) practicability, and (5) whether it is appropriate for the type of vehicle identified in the proposed regulation.

**Second Category of Opinions: Interpretation of FMVSS 217**

**EXHIBIT B**

15. According to 49 CFR§ 571.217 S2, "the purpose of this standard is to minimize the likelihood of occupants being thrown from the bus and to **provide a means of readily accessible emergency egress**." [*emphasis added*]  Ultimately, the purpose of ensuring that school age children are able to egress a school bus as quickly as possible during an emergency is the primary purpose of FMVSS 217 or 49 CFR§ 571.217.  **This purpose cannot be achieved if the emergency door is locked while the bus is operational**.

16. According to 49 CFR§ 571.217 S5.3.3.1, "each school bus emergency exit door **shall allow manual release** of the door **by a single person**, **from both inside and outside the passenger compartment**."   This subsection further states that such a release mechanism "shall operate **without the use of remote controls or tools**, and notwithstanding any failure of the vehicle's power system."[*emphasis added*]   While serving as the Associate Administrator, my staff and I discussed the need to open a rear emergency door on a school bus several times.  Specifically, the need for a single person to open the emergency door but, more specifically, for emergency response personnel and school age children to have the ability to open the door during an emergency.  This is reinforced by the specific force requirements mandated by NHTSA to open the door during an emergency.

17. 49 CFR§ 571.217 also states, "when the release mechanism is not in the position that causes an emergency exit door to be closed and the vehicle's ignition is in the "on" position, a **continuous warning sound shall be audible** at the driver's seating position and in the vicinity of the emergency exit door." [*emphasis added*] This language allows the driver of a school bus to be aware that the emergency door handle has been moved from the fully latched position.  This provides the necessary warning to the driver to take appropriate action.

18. According to 49 CFR§ 571.217 subsection S5.2.3.3, "The engine starting system of a bus shall not operate if any emergency exit is locked from either inside or outside the bus. For purposes of this requirement, "locked" means that the release mechanism cannot be activated and the exit opened by a person at the exit without a special device such as a key or special information such as a combination."  In a letter of interpretation dated November 27, 1990, NHTSA's Chief Counsel provided a response to a question from the Minnesota State Patrol regarding how FMVSS 217 locking of emergency doors is looked at by the agency.  Ultimately, NHTSA indicated that the engagement of a "vandal lock" after a school bus is started does not technically violate 49 CFR§ 571.217 subsection S5.2.3.3. That said, however, the letter also states that "school bus doors, including e**mergency doors, should not be locked when the bus is in operation**, and we [NHTSA] believe that, in practice, they remain unlocked when the buses are in use." [*emphasis added*]  While Associate Administrator at NHTSA my staff and I always believed that the purpose of an emergency door is to allow vehicle occupants to egress out of the emergency exit as quickly as possible and never be locked while a vehicle is in operation.  Since the advent of FMVSS 217, this has been and continues to be the agency's position.  Further, while I was an accident investigator at the National Transportation Safety Board (NTSB) the agency's philosophy was consistent with the NHTSA's philosophy regarding the locking of school bus emergency exit doors.

**EXHIBIT B**

19. While serving as the Associate Administrator for Rulemaking, I was fully integrated into the review and decision-making process associated with requests for regulatory interpretations submitted to NHTSA's Chief Counsel.  Based on my experience while serving at NHTSA the interpretation of the regulations are narrow in focus and only answer the question(s) raised by the requester. This is exemplified by the November 27, 1990 interpretation letter to the Minnesota State Police, which specifically addressed the compliance of 49 CFR§ 571.217 subsection S5.2.3.3 as it relates to a "Vandal Lock."  To be clear, based on my knowledge and experience of internal decision-making at NHTSA, the interpretation did not address any of the other regulatory provisions associated with the design and installation of an emergency door that are required within other subsections within FMVSS 217, including but not limited to S5.3.3.1.

20. According to 49 CFR§ 571.217 subsection S5.5.3, the rear emergency door must display "**Concise operating instructions** describing the motions necessary to unlatch and open the emergency exit" and such instructions "shall be located within 15 centimeters of the release mechanism on the inside surface of the **bus**. These instructions shall be in letters at least 1 centimeter high and of a color that contrasts with its background." NHTSA also provides examples of what language the school bus manufacturer should consider.  For example, the two examples state "(1) Lift to Unlatch, Push to Open or (2) Turn Handle, Push Out to Open."  While Associate Administrator my staff and I considered if the example language needed to be changed, but since it was focused on school age childrens' ability to read the instructions, the agency kept the language as is.  The conciseness of the operating instructions is the basis as to why the agency kept the examples short and basic in the regulatory language.

21.  As the Associate Administrator of Rulemaking at NHTSA, the requirements for bus emergency exits and window retention and release were within my responsibilities for administering FMVSS 217.  The regulatory requirements are prescriptive and require the OEM to ensure that emergency doors cannot be locked while the vehicle is operational.  The regulations also require a continuous audible alarm sounding both in the vicinity of the door as well as near the vehicle driver when the latch is not fully engaged and the door is closed.  This is directly relevant to this case because it correlates to the criteria how the school bus was both designed and manufactured.  The design and installation of the emergency door, locking mechanism and audible alarm are directly relevant to the compliance of the vehicle involved in this accident.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on__5_____ day of _____June_____, 2020.

_____

Christopher J. Bonanti

3808105_1

**EXHIBIT B**