United States District Court
Southern District of Texas
**ENTERED**
December 15, 2020
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | | |
|---|---|---|
| GABRIEL MIRANDA, SR., *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 7:18-CV-353 |
| | § | |
| NAVISTAR, INC., *et al*, | § | |
| | § | |
| Defendants. | § | |

## AMENDED[1] ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING ALL OTHER MOTIONS AS MOOT

## I.     Background

Now before the Court are the following Motions filed by the parties: Defendants Navistar, Inc., Navistar International Corporation, IC Bus, LLC, and IC Bus of Oklahoma, LLC's Motion for Summary Judgment on all claims filed against them by Plaintiffs Gabriel Miranda, Sr. and Maria Fuentes, individually and as representatives of the Estate of their son, Gabriel Miranda, Jr. (Dkt. No. 46); Plaintiffs' Motion for Leave to File Surreply to Defendants' Motion for Summary Judgment and Defendants' responsive Motion to Strike (Dkt. Nos. 51, 52); and Plaintiffs' Motion for Leave to File Supplement to Surreply and Defendants' responsive Motion to Strike (Dkt. Nos. 72, 75).[2]  In this strict liability action arising from the death of Gabriel, Jr. after he exited the rear emergency exit door of a school bus traveling at highway speed, Plaintiffs seek to hold Defendants liable for the alleged unreasonably dangerous and defective design, manufacture, distribution, and/or marketing of the bus on the following grounds:

---

[1]  The amendment is for the sole purpose of correcting the caption and fully identifying Plaintiffs.
[2]  Various other motions are also pending, and are mooted by the Court's final disposition of the case through summary judgment. *See* (Dkt. Nos. 43, 53, 54, 71, 73, 77, 78).

     (a)     In the event the bus was traveling at highway speed, the rear emergency exit door of the bus remained unlocked and could be opened to allow a passenger to fall out while the bus was in motion during normal operation;

     (b)     The rear emergency exit door of the bus was able to be opened or tampered with while the bus was in motion outside a true emergency situation;

     (c)     There was no automated system to lock the rear emergency exit door to prevent it opening while the bus was in motion or traveling over a certain designated speed, such as highway speed;

     (d)     There was no adequate warning or alarm system inside the bus, especially to the driver, to alert when someone was attempting to open the rear emergency exit door;

     (e)     There was no manual override available to the driver to lock the rear emergency exit door when the bus was in motion; [and/or]

     (f)     The vehicle did not have, or had inadequate, warning stickers, placards, or any other proper documentation or notice to alert users regarding the hazardous conditions, as stated above, involving the use and operation of the vehicle.

(Dkt. No. 38 at §§ III, IV).  Plaintiffs allege that these defects "directly and in natural and continuous sequence produced or contributed substantially to Gabriel, Jr.'s death," and request damages individually and on behalf of Gabriel, Jr.'s estate.  (*Id.* at §§ IV-VI).  Defendants move for summary judgment on the grounds that "federal regulations governing the design and manufacture of school bus emergency exits—which exist to ensure that passengers are able to safely and speedily exit the bus under any conceivable emergency scenario—prevent the types of obligations Plaintiffs seek to impose" through their strict liability claims, which are thus preempted by federal law.  (Dkt. No. 46 at p. 8).  The parties' remaining Motions concern Plaintiffs' attempts to file a surreply and supplement to that surreply in opposition to summary judgment.  (Dkt. Nos. 51, 52, 72, 75).  Upon consideration of the Motions and the parties' responsive briefing, in light of the relevant law, the Court finds that Plaintiffs' strict liability claims are preempted and summary judgment must be granted for the following reasons.

## II.    Standard of Review

A district court must grant summary judgment when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  A fact is material if it might affect the outcome of the lawsuit under the governing law, and is genuinely in dispute only if a reasonable jury could return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A party moving for summary judgment has the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings and materials in the record, if any, which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); FED. R. CIV. P. 56(a), (c).  Once the moving party carries its burden, the burden shifts to the nonmovant to go beyond the pleadings and provide specific facts showing the existence of a genuine issue for trial.  *Celotex*, 477 U.S. at 324; FED. R. CIV. P. 56(c).   In conducting its review of the summary judgment record, the court "may not make credibility determinations or weigh the evidence" and must resolve doubts and reasonable inferences regarding the facts in favor of the nonmoving party.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 255; *Dean v. City of Shreveport*, 438 F.3d 448, 454 (5th Cir. 2006).   However, the nonmovant cannot satisfy its burden with "conclusory allegations, speculation, and unsubstantiated assertions which are either entirely unsupported, or supported by a mere scintilla of evidence."  *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 229 (5th Cir. 2010); *see also Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003) ("Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment.").

### III.    Overview of Undisputed Summary Judgment Evidence

### A.    The Bus

Defendants present uncontested evidence that this action concerns a 2010 CE-Series school bus (rather than a 2011 model, as Plaintiffs' pleading alleges), and that Defendants "designed, manufactured, and distributed this bus[.]"  (Dkt. No. 46, Exh. A at ¶ 3; *see* Dkt. No. 38 at §§ III, IV).  The rear emergency exit door at issue is located in the center of the back panel of the bus, and is equipped with a release mechanism that allows the door to latch and unlatch, as shown below:



(Dkt. No. 46, Exh. A at ¶¶ 4, 5; *see also* Exh. C).  To open the door from the inside when the release is engaged, a person must unlatch the door by pulling the red lever upward from a horizontal to a vertical position, then push against the door.  (*Id.*, Exh. A at ¶ 6).  The door opens outward, swinging toward the passenger side of the bus.  (*Id.*).  To the left of the release, posted on the door's inside surface, is a sign identifying the door as an "EMERGENCY EXIT" and providing the following instructions: "TO OPEN LIFT UP RED BAR PUSH OUT."  (*Id.* at ¶

11).  When the bus's ignition is in the "ON" position, a continuous, audible alarm will sound unless the door is fully closed and the release is fully engaged (i.e., with the red lever in the horizontal, latched position).  (*Id.* at ¶ 7).

The door is also equipped with a separate "vandal lock" to prevent unauthorized persons from accessing the interior of the bus when the bus is unattended, as shown below:

 

(*Id.* at ¶ 8; *see also* Exh. C).  The vandal lock is a simple barrel bolt latch consisting of a steel bolt inside a sheath that is connected to the door frame.  (*Id.*, Exh. A at ¶ 9; *see also* Exh. D).  When engaged, the bolt slides to the left into a steel ring that is connected to the door itself.  (*Id.*).  When the bus's ignition is in the "ON" position, a continuous, audible alarm will sound at the door and in the driver's compartment if the vandal lock is bolted.  (*Id.*, Exh. A at ¶ 10).  Further, the bus's engine starting system will not operate when the vandal lock is engaged.  (*Id.*).

## B.    The Accident

On the morning of November 14, 2016, 13-year-old Gabriel, Jr., along with other members of his eighth-grade class at Vernon Middle School in Harlingen, Texas, boarded the

bus for a field trip to the University of Texas-Rio Grande Valley campus in Edinburg, Texas. *See* (*id.*, Exhs. E, F, H, I).  Gabriel sat in the back row near the exit.  *See* (*id.*, Exhs. H, I).  While the bus was en route, traveling north on Interstate 69 at highway speed, Gabriel opened the rear emergency exit door and either jumped or fell to the pavement below.  *See* (*id.*, Exhs. E-I).[3] Gabriel sustained severe trauma to his head, and after being transported by ambulance to the emergency room, was pronounced dead later that morning.  *See* (*id.*, Exh. J at pp. 5-7; Exhs. L-N).

## IV.     Defendants' Motion for Summary Judgment

## A.     Conflict Preemption

Defendants move for summary judgment with an appeal to the doctrine known as "conflict preemption," asserting and providing evidence that the rear emergency exit door of the subject bus was designed, manufactured, and functioning on the date in question in compliance with federal regulations, and taking the position that Plaintiffs' theories of strict liability seek to impose duties or requirements that conflict with those regulations so as to preempt Plaintiffs' claims.  (Dkt. No. 46).  Conflict preemption originates from the Supremacy Clause of the U.S. Constitution, which establishes that federal law "shall be the supreme Law of the Land…any Thing in the Constitution or Laws of any State to the Contrary notwithstanding," U.S. CONST., Art. VI, cl. 2, and from the U.S. Supreme Court's interpretation of the clause to mean that, "[e]ven where Congress has not completely displaced state regulation in a specific area, state law is nullified to the extent that it actually conflicts with federal law," *e.g.*, *Fid. Fed. Sav. & Loan*

---

[3]  Although, in the context of responding to Defendants' Motion, Plaintiffs present nothing to controvert Defendants' evidence that Gabriel, Jr. jumped from the exit to his death, Plaintiffs have otherwise disputed that Gabriel committed suicide, both in this case and in a related case previously before this Court and currently on appeal, Civil Action No. 7:18cv348 *Estate of Gabriel Miranda, Jr. v. Harlingen Consol. Indep. Sch. Dist., et al.*  Since Defendants' Motion does not turn on the resolution of this issue in their favor, the Court disregards as irrelevant all evidence purporting to show that Gabriel committed suicide.

*Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982).  Relevant to this case, regulations enacted by a federal agency within the scope of its congressionally delegated authority "can have a preemptive effect equal to that of federal laws," and can preempt state-law tort claims that, by virtue of the duties or requirements they impose, conflict with such regulations.  *O'Hara v. Gen. Motors Corp.*, 508 F.3d 753, 758 (5th Cir. 2007) (citing *de la Cuesta*, 458 U.S. at 153); *see La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 357 (1986); *Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 869 (2000).  Conflict preemption may arise in one of two ways: (1) when compliance with federal regulations and state law "is a physical impossibility"; or (2) "when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *E.g.*, *O'Hara*, 508 F.3d at 758 (quoting *de la Cuesta*, 458 U.S. at 153).

It is undisputed that the federal regulations at issue are contained within Federal Vehicle Motor Safety Standard 217 ("FMVSS 217"), 49 C.F.R. § 571.217, which governs "[b]us emergency exits and window retention and release," and that the National Highway Traffic Safety Administration ("NHTSA") promulgated FMVSS 217 under the authority granted it by the Federal Safety Act ("FSA"), 49 U.S.C. § 30101, et seq.  (Dkt. No. 46 at p. 11); *see O'Hara*, 508 F.3d at 756, 758.  The FSA contains an express preemption clause providing that "a State…may prescribe or continue in effect a standard…only if the standard is identical to the standard prescribed under this chapter," but also a savings clause stating that "[c]ompliance with a motor vehicle safety standard prescribed under this chapter does not exempt a person from liability at common law."  49 U.S.C. § 30103(b), (e); *see O'Hara*, 508 F.3d at 758-59.  Precedent directs that the savings clause "removes tort actions from the scope of the express preemption clause" and "preserves those actions that seek to establish greater safety than the minimum safety achieved by a federal regulation intended to provide a floor."  *O'Hara*, 508 F.3d at 759 (quoting

*Geier*, 529 U.S. at 870).  When read together, the two clauses permit application of "ordinary conflict pre-emption principles," such that Defendants are entitled to summary judgment if they can show either: (1) that it is physically impossible to comply with FMVSS 217 and the common law tort duties or requirements Plaintiffs seek to enforce through their strict liability claims; or (2) that these claims present an obstacle to the accomplishment and execution of the purposes of FMVSS 217.  (Dkt. No. 46 at p. 11); *O'Hara*, 508 F.3d at 759 (quoting *Geier*, 529 U.S. at  870-71).

### B.    Inadequate Warning Claims

Of Plaintiffs' six theories of strict liability, the following two are premised on Defendants' alleged failure to provide adequate warnings for the rear emergency exit door: (1) "[t]here was no adequate warning or alarm system inside the bus, especially to the driver, to alert when someone was attempting to open the rear emergency exit door"; and (2) "[t]he vehicle did not have, or had inadequate, warning stickers, placards, or any other proper documentation or notice to alert users regarding the hazardous conditions…involving the use and operation of the vehicle."  (Dkt. No. 38 at § IV(4)(d), (f)).  Defendants assert that Plaintiffs "have not made any attempt to explain how any additional warnings could have conceivably prevented [Gabriel, Jr.'s] injuries and death," nor have they "identified the specific form and content that they believe such warnings should have taken."  (Dkt. No. 46 at p. 15).  However, even if they had, FMVSS 217 "contains precise, detailed requirements concerning the signage for emergency exits," as well as requirements for the bus's alarm system, that render impossible Defendants' compliance with both the governing federal regulations and the duties sought to be imposed by Plaintiffs' inadequate warning claims.  (*Id.* at pp. 15-16).

The signage requirements appear in subpart 5.5.3, which mandates that each emergency

exit have: "the designation 'Emergency Door' or 'Emergency Exit' as appropriate, in letters at least 5 centimeters high, of a color that contrasts with its background"; and "concise" operating instructions—such as, for example, "Lift to Unlatch, Push to Open" or "Turn Handle, Push Out to Open"—"located within 15 centimeters of the release mechanism on the inside surface of the bus" and "in letters at least 1 centimeter high, of a color that contrasts with its background." 49 C.F.R. § 571.217, S5.5.3(a), (b). Defendants present uncontested evidence that the subject bus's signage, which uses the "Emergency Exit" designation and the instructions, "To Open Lift Up Red Bar Push Out," complied with all of these requirements, and argue that they "simply could not have posted further warnings or instructions on or around the rear emergency exit without violating the regulations' explicit demand for *concision* in emergency door signage[.]" (Dkt. No. 46 at p. 16 (emphasis in original); Exh. A at ¶¶ 11, 12).

Relative to the bus's alarm system—and more specifically, Plaintiffs' complaint that it did not sound an adequate alarm, especially to the driver, when the rear emergency exit door was being opened—subpart 5.3.3.1 provides that "[w]hen the release mechanism is not in the position that causes an emergency exit door to be closed and the vehicle's ignition is in the 'on' position, a continuous warning sound shall be audible at the driver's seating position and in the vicinity of the emergency exit door." 49 C.F.R. § 571.217, S5.3.3.1. Defendants present undisputed evidence that the subject bus had an alarm system that complied with these requirements, and that this system functioned properly at the time the bus was manufactured and upon inspection of the bus after this litigation ensued. (Dkt. No. 46, Exh. A at ¶¶ 7, 13). They argue that "[t]o date, Plaintiffs have not explained the perceived inadequacy of the alarm system or proffered a safer alternative design that complies with the regulations." (Dkt. No. 46 at p. 16).

As Defendants note, Plaintiffs' response makes no effort to dispute that their inadequate

warning claims are preempted under the "impossibility" test for conflict preemption.  (Dkt. No. 50 at p. 1 n.1).  Absent any explanation by Plaintiffs for how Defendants may have enhanced the rear emergency exit door signage, yet still complied with S5.5.3's requirements and retained concision in the warning instructions, or how Defendants may have improved the alarm system without contravening the requirements of S5.3.3.1, Plaintiffs have failed to show that Defendants could comply with FMVSS 217 as well as the duties sought to be imposed by Plaintiffs' inadequate warning theories.  Plaintiffs' strict liability claims premised on these theories are preempted, and summary judgment must be granted in this respect.

**C.     Inadequate Locking Mechanism Claims**

**1.     Overview of Claims and Defendants' Asserted Grounds for Summary Judgment**

The parties' chief dispute concerns Plaintiffs' other four theories of liability, all variations of their principal complaint that the rear emergency exit door of the subject bus could not be locked, and could be opened, while traveling at highway speed: (1) "[i]n the event the bus was traveling at highway speed, the rear emergency exit door of the bus remained unlocked and could be opened to allow a passenger to fall out while the bus was in motion during normal operation"; (2) "[t]he rear emergency exit door of the bus was able to be opened or tampered with while the bus was in motion outside a true emergency situation"; (3) "[t]here was no automated system to lock the rear emergency exit door to prevent it opening while the bus was in motion or traveling over a certain designated speed, such as highway speed"; and (4) "[t]here was no manual override available to the driver to lock the rear emergency exit door when the bus was in motion."  (Dkt. No. 38 at § IV(4)(a)-(c), (e)).

In support of their arguments that these claims are preempted under the impossibility test, Defendants point to the following requirements contained within FMVSS 217: (1) subpart

5.3.3.1's mandate that "[e]ach school bus emergency exit door shall allow manual release of the door by a single person, from both inside and outside the passenger compartment," and that "[t]he release mechanism shall operate without the use of remote controls or tools, and notwithstanding any failure of the vehicle's power system"; and (2) subpart 5.2.3.3's requirement that "[t]he engine starting system of a bus shall not operate if any emergency exit is locked from either inside or outside the bus," and its directive that "[f]or purposes of this requirement, 'locked' means that the release mechanism cannot be activated and the exit opened by a person at the exit without a special device such as a key or special information such as a combination." 49 C.F.R. § 571.217, S5.2.3.3, S5.3.3.1; (Dkt. No. 46 at p. 12). Defendants assert that "[t]o cure the perceived 'defects' Plaintiffs allege in this case—i.e., the lack of an automated locking system and/or some type of 'override' available to the driver—would require [Defendants] to violate these regulations." (Dkt. No. 46 at p. 13). "Specifically, any kind of 'lock' or 'override' mechanism would, by definition, render it impossible for a single person to manually operate the exit from inside." (*Id.*). "Likewise, it is impossible to conceive of an 'automated' locking or override system that does not require the use of remote controls, tools, or a power system." (*Id.*).

Defendants draw support for their arguments from the preliminary report of Plaintiffs' retained engineering expert, Robert Berriman. (*Id.* at pp. 14-15). According to Berriman, Defendants' design for the rear emergency exit door is "flawed" because it "allows for the door to be opened by any force capable of releasing the latch mechanism" while traveling at "freeway speeds." (Dkt. No. 46, Exh. Q at p. 3).[4] Berriman provides three examples of a safer design: (1) what he calls the "simplest" option of "taking the real-time speed signal from the bus and adding a simple circuit to drive the lock mechanism"; (2) the more "modern" option of "a speed signal

---

[4] Plaintiffs also submit Berriman's report in support of their response. *See* (Dkt. No. 49, Exh. A).

to a circuit that drives an electromagnetic lock" or a "pneumatic bolt" that is "powered and activated" above 3 miles per hour, and that disengages below 3 miles per hour; or (3) a "smart door, with its own independent speed monitoring" that "could use combinations of accelerometers, inclinators, gyroscope and GPS to…unlock[ ] only at safe speed conditions[.]" (*Id.*).   Defendants submit that, although Berriman provides no further design details, his proposed designs would clearly run afoul of S5.3.3.1's "requirement that the rear emergency exit door operate 'without the use of remote controls or tools, and notwithstanding any failure of the vehicle's power system.'" (Dkt. No. 46 at p. 14).

In the alternative, Defendants invoke the second basis for conflict preemption, arguing that Plaintiffs' inadequate locking mechanism claims present an obstacle to the accomplishment and execution of FMVSS 217's purpose.   (*Id.* at pp. 16-18).   Defendants highlight that the relevant inquiry has been described as a "matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects," and giving "equal force" to what "must be implied" as well as what is expressed.   (*Id.* at pp. 16-17); *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) (some internal quotations omitted).   The explicit goal of the FSA is "to reduce traffic accidents and deaths and injuries resulting from traffic accidents," and to this end, Congress and the Secretary of Transportation have charged the NHTSA with the task of prescribing federal "motor vehicle safety standards" and carrying out "needed safety research and development."   (Dkt. No. 46 at p. 17); 49 U.S.C. §§ 30101, 30111(a); *see* 49 C.F.R. § 1.95(a).   On November 2, 1992, the NHTSA published a final rule amending FMVSS 217 to "revis[e] the minimum requirements for school bus emergency exits and improve[] access to school bus emergency doors."   (Dkt. No. 46 at p. 17); Federal Motor Vehicle Safety Standards; Bus Emergency Exits and Window Retention and Release, 57 Fed.

Reg. 49,413-49,425 (Nov. 2, 1992) (to be codified at 49 C.F.R. pt. 517).  The final rule explained

the purpose of the amendment with the following background:

> In May 1988, 27 persons died of smoke inhalation in the fire resulting from the high-speed crash of a pick-up truck (driven by a drunk driver) and a used school bus in Carrollton, Kentucky.   Several factors were involved in this tragic event, which represented the first fire-related occupant deaths on a school bus-type vehicle since NHTSA began compiling statistics on traffic fatalities in 1975.   Some observers suggested that more occupants might have survived the fire if the bus had been equipped with additional (or more accessible) emergency exits. ….  This crash focused considerable public interest on several school bus safety issues, including emergency exits, as well as on the continuing problem of drunk driving. More recently, attention was again focused on school bus exits by the September 1989 crash in Alton, Texas, in which a tractor semi-trailer struck a school bus, which then rolled into a water-filled gravel pit. Twenty-one students drowned as a result of this crash.

(Dkt. No. 46 at p. 17); 57 Fed. Reg. 49,413.  This led the NHTSA to undertake "a comprehensive

review of its vehicle standards and other programs for school bus safety," and to conclude that

"[a]n important factor in minimizing post-crash injuries and deaths on buses is the speed and

ease with which occupants can evacuate the vehicle in an emergency."  (Dkt. No. 46 at p. 18); 57

Fed. Reg. 49,413.  As the NHTSA explained,

> [t]he agency believes that there are benefits to providing a variety of emergency exit types distributed throughout the bus as a precaution against a wide variety of potential emergency exit situations. Roof hatches would be a very beneficial type of emergency exit when the bus is on its side; however, it would be difficult for many students to use roof exits in other situations. It is also possible to envision a situation in which a bus comes to rest in a position where one or more emergency exits on a side would be too close to a tree, pole, guardrail, bridge abutment or other vehicle to allow it to open, or to open completely. In such an instance, it would be useful to have emergency exits distributed in other areas of the bus. Accordingly, the agency has decided that school buses should have a variety of exit types distributed throughout the passenger compartment.

(Dkt. No. 46 at p. 18); 57 Fed. Reg. 49,415.  With the express intent "to facilitate the exiting of

occupants from a bus after an accident and thus improve the likelihood of their survival," the

final rule amended FMVSS 217 to require larger school buses to have an increased number of

exits, provide improved access to side emergency doors, and improve the visibility of school bus

emergency exits. (Dkt. No. 46 at p. 18); 57 Fed. Reg. 49,413. The rule also recodified yet retained, for all substantive purposes, the subparts to which Defendants appeal. (Dkt. No. 46 at p. 17); 57 Fed. Reg. 49,424. According to Defendants, the alleged safer designs advocated by Plaintiffs "are completely incongruous with these regulatory aims" since, "[f]ar from ensuring the 'speed and ease with which occupants can evacuate,' an automated locking mechanism would, by definition, impede this goal," and could actually prevent escape in the event the system is disabled or damaged in an accident. (Dkt. No. 46 at p. 18).[5]

Finally,[6] Defendants assert that the Fifth Circuit has already decided "this issue" their favor in *Estrada v. Carpenter Body Works, Inc.*, 987 F.2d 770, 1993 WL 67179 (5th Cir. 1993), which is binding on this Court.[7] (*Id.* at pp. 19-20). Defendants observe that, like this case, *Estrada* arose from the death of a student as a result of injuries sustained when she jumped or fell from the rear emergency exit of a school bus. *Estrada*, 1993 WL 67179, at *1. The student's parents brought suit against the bus manufacturer, asserting negligence and strict liability claims premised, in part, on the theory that the bus was "unreasonably dangerous and defectively designed" because "the emergency exit door could be opened while the bus was moving." *Id.* In support of its motion for summary judgment, which the district court granted, the defendant offered the affidavit of its senior consultant for technical affairs, who averred that "[d]esigning a door that could not be opened while the bus is moving would totally negate the door's utility as

---

[5] Relevant to this argument, Defendants assert that Plaintiffs' expert, Berriman, "makes no effort to account for contingencies that might arise in the event of a malfunction (such as a break in the 'circuit' or a 'misread' by the controlling device) that causes the door to remain locked at inappropriate times, the consequences of which could be catastrophic in an emergency situation where occupants—mainly children—need to exit quickly." (Dkt. No. 46 at pp. 14-15).

[6] Defendants' Motion also anticipates a responsive argument by Plaintiffs—that a 1990 opinion letter by the NHTSA defeats preemption—but the Court finds this argument best considered in the ensuing section. *See* (Dkt. No. 46 at pp. 20-23).

[7] Defendants are correct that, as an unpublished decision issued before January 1, 1996, *Estrada* constitutes precedent. *See* (Dkt. No. 46 at p. 19 n.51); Fifth Cir. Rule 47.5.3.

an emergency exit, and would violate the requirements of the Code of Federal Regulations, Title 49, Paragraph 571.217, Section S5.2.3.2[.]" *Id.* at *2.[8]   On appeal, the Fifth Circuit found that the affidavit of the plaintiffs' safety engineer expert "fail[ed] to address, much less rebut, the expert testimony presented by [the defendant]—that, obviously, in order to have any utility as a safety device, an emergency exit door on a school bus must be designed so that it can be opened while the bus is moving." *Id.* at *3.   The Court also found that the responsive affidavit "ignore[d] the federal standards…regarding the design of emergency exit doors on school buses, and fail[ed] to explain why [the defendant] should have designed the emergency exit door in violation of those standards." *Id.*   Based on its review of this and other summary judgment evidence, the Court found that the plaintiffs had failed to raise a genuine issue of material fact on their claims, and affirmed the judgment of the district court. *Id.* at *4.   According to Defendants, "[t]he instant case is exactly like *Estrada* and warrants the same result," especially given the opinion of their own expert, the NHTSA's former Associate Administrator for Rulemaking, Christopher Bonanti, "affirming that an emergency exit would lose all utility if it could be opened while driving, and would further violate the provisions of [FMVSS 217]."  (Dkt. No. 46 at p. 20; *see* Exh. B).

**2.      Parties' Responsive Arguments and Court's Analysis**

**a.      Testimony of Defendants' Corporate Representative**

In opposing Defendants' arguments that their inadequate locking mechanism claims are preempted, Plaintiffs first respond that Defendants' corporate representative, Joseph Labonte, admitted in his deposition that "there is no federal safety standard that governs an in-motion lockable rear emergency exit door," pointing to the following testimony:

---

[8] As noted *infra*, S5.2.3.2 has since been recodified as S5.2.3.3, but in all relevant respects, has retained the same language.

Q.      So is there anything in [FMVSS] 217 that talks about having a locked rear emergency exit door while the bus is in motion?

A.      No.

….

Q.      So there is no federal standard governing a lockable in motion rear emergency exit door, correct?

….

A.      That's correct, however, it's the motion of the engine that is to be prevented from starting.

Q.      But by the plain language of [FMVSS] 217 and by the official interpretation of the NHTSA on [FMVSS] 217, there is nothing governing lockable in motion rear emergency exit doors in [FMVSS] 217, correct?

….

A.      Correct.

(Dkt. No. 49 at pp. 10-11; Exh. B at pp. 263-64).   Defendants reply with citation to precedent observing that "[i]t is…generally prohibited for a lay witness to interpret statutes and to give legal opinions."  (Dkt. No. 50 at p. 12); *United States v. El-Mezain*, 664 F.3d 467, 511 (5th Cir. 2011), as revised (Dec. 27, 2011).   However, they principally argue that even if Plaintiffs could offer Labonte's testimony for this purpose, such testimony does not constitute an admission that Plaintiffs' proposed locking mechanism comports with FMVSS 217, and the Court agrees.  (Dkt. No. 50 at pp. 12-14).   First, the testimony follows Plaintiffs' counsel's questioning of Labonte on one of three NHTSA opinion letters on which Plaintiffs rely, all of which seek the agency's interpretation of the effect of the current S5.2.3.3[9] on vandal locks, i.e., "locking systems installed for the doors and emergency exits of school buses intended to prevent unauthorized persons from entering the school bus through those exits when the bus is unoccupied and unattended."  (Dkt. No. 49, Exh. E; *see also* Exhs. D, F; Exh. R at pp. 254-64).   The November 27, 1990 letter on which counsel questioned Labonte originated from a query to the agency about "whether [S5.2.3.3] prohibits the use of a vandal lock system that, although it must be unlocked

---

[9]   At the time of the December 7, 1982 and November 27, 1990 letters, this subpart was codified as S5.2.3.2, and by the time of the March 30, 1999 letter, had been recodified as S5.2.3.3, but retained substantively identical language.

for the bus to start, can be relocked once the bus is started," and elicited the NHTSA's interpretation that "the prohibition in [S5.2.3.3] focuses exclusively on whether the vehicle can be started when any emergency exit is locked," such that "[i]f the school bus cannot be started when an emergency exit is locked, the bus complies with [S5.2.3.3], even if an emergency exit can be locked once the bus is started."  (Dkt. No. 49, Exh. E; *see also* Dkt. No. 46, Exh. P).[10] When confronted with this interpretation, Labonte correctly responded that "it's not a regulation," and both the cherry-picked testimony and additional portions of Labonte's testimony offered by Defendants' reply evince his disagreement with the position that the regulations themselves—as opposed to the NHTSA opinion letters—permit "lockable in motion rear emergency exit doors."  (Dkt. No. 50, Exh. R at p. 256); *see Christensen v. Harris Cty.*, 529 U.S. 576, 586-87 (2000) (agency "[i]nterpretations such as those in opinion letters…lack the force of law" and are "entitled to respect" only if persuasive).  As Labonte attempted to explain, when he qualified that "it's the motion of the engine that is to be prevented from starting," "[o]ur [Defendants'] interpretation of FMVSS 217 is that the vehicle shall not start if…any of the emergency exits are…locked," and "we believe that by that…they do not want the engine to be running when an emergency exit is locked, period."  (Dkt. No. 50, Exh. R at p. 108).  Also, the portion of Labonte's testimony offered by Plaintiffs concerns the NHTSA's interpretation of a single subpart without reference to or examination of S5.3.3.1, which Labonte also invoked as a prohibition against the locking mechanism urged by Plaintiffs:

> Q.     And so [S5.2.3.3] is the only section where you're saying references that you and any other bus manufacturer cannot install a school bus with a lockable in motion rear emergency exit door?
> ….
> A.     No, that's not the only section.

---

[10]  The 1982 letter provides, and the 1999 letter reiterates, essentially the same opinion: that "nothing in [S5.2.3.3] prohibits the installation of locking doors as long as the vehicle cannot be started with the emergency door in the locked position."  (Dkt. No. 49, Exhs. D, F).

Q.      Okay.  Tell me what other section.

A.      Within FMVSS 217 [it] says that it shall be able to be opened without the use of or loss of power without remote control.  It must be manual.  Without the use of tools or other means to open; that it must be readily accessible to be opened, and I'm paraphrasing.

Q.      I understand.  So if there were a locking mechanism, say, for example, if the bus gets up to five miles an hour and then the rear emergency door locks and then if the bus goes above that, it stays locked.  And then when the bus reduces its speed down to five miles an hour, it unlocks.  Would that not fit into this manual description that you're talking about with [FMVSS] 217?

A.      I believe it would not.  During that time period wherein it's locked, it's not able to be opened manually without the use of additional tools.  It's not able to be opened without using a remote switch of some sort, whether it be automatic or bypassed.

(*Id.* at pp. 212-14).   Rather than constituting an "admission" against preemption, Labonte's testimony challenges whether FMVSS 217 permits the type of in-motion lock Plaintiffs seek to impose through their inadequate locking mechanism claims.

**b.      Plain Language of S5.2.3.3**

Plaintiffs next argue that the "plain language" of S5.2.3.3—the subpart addressed by the NHTSA opinion letters—"addresses a lock issue only at the time the bus engine is started," and that "[t]here is no language that prohibits the engagement of a lock after the bus is in motion." (Dkt. No. 49 at p. 11).   Even accepting, as the NHTSA did when addressing vandal locks, that this subpart does not explicitly extend the prohibition against starting a bus's engine while an emergency exit lock is engaged, to driving while that lock is engaged, the Court agrees with Defendants that "it does not necessarily follow that an 'in-motion' locking system is compatible with [FMVSS 217's] overall aims and purpose."  (Dkt. No. 50 at p. 10).   In fact, the NHTSA effectively conceded this point when, in its 1990 letter, it noted that regardless of the absence of any such explicit rule, "[s]chool bus doors, including emergency doors, *should not be locked when the bus is in operation*, and we believe that, in practice, they remain unlocked when the buses are in use."  (Dkt. No. 49, Exh. E) (emphasis added).   Moreover, regardless of whether the

language of S5.2.3.3 permits an in-motion lock, Plaintiffs' argument ignores Defendants' additional appeal to S5.3.3.1.

c.      **NHTSA Letters**

Plaintiffs' next argument directly invokes the NHTSA opinion letters previously discussed, arguing that since the agency "is in the best position to interpret" FMVSS 217, the letters "confirm[ ] there is no prohibition [on] the installation of locking emergency exit doors after the bus engine has started."  (Dkt. No. 49 at p. 12).  Plaintiffs specifically cite to the NHTSA's opinion first stated in the 1982 letter (and affirmed in the 1999 letter) that "nothing in [FMVSS 217] prohibits the installation of locking doors as long as the vehicle cannot be started with the door in the locked position," and to the agency's observation in the 1990 letter that "the only way whereby the standard could include a provision to prevent emergency exits on school buses from being relocked once the bus is started would be for the agency to undertake a rulemaking action to amend [S5.2.3.3]."  (*Id.* at pp. 12-13; Exhs. D-F).  Plaintiffs further assert that "[t]he Court should not place any credence on Defendants' hired engineer [Bonanti] over the…NHTSA's published clear and unambiguous conclusions[.]"  (Dkt. No. 49 at p. 13).

The Court has already addressed certain aspects of these arguments (and Defendants' position on them), and reiterates that the letters do not have the comprehensive scope that Plaintiffs give them; they address a single subpart's effect on the engagement of a vandal lock after a bus's engine has started, and do not consider the extent to which S5.2.3.3, S5.3.3.1, or the purposes or objectives of the regulations as a whole would allow the type of in-motion lock proposed by Plaintiffs.  To expound further on the query giving rise to the 1990 letter, Defendants point out that the query itself was motivated by the following concerns:

> We [the school bus inspection program for the Minnesota State Patrol] are finding many of the vandal locks that even though they are unlocked, and the bus can start and run, the

lock may be relocked by a student while the bus is running.  Granted, it would not kill the
bus engine but would render the starting mechanism inoperable if the engine is shut off or
would die.  This situation appears loaded with potential danger if the driver finds himself
in a precarious situation and kills the engine only to find it won't restart.

(Dkt. No. 46, Exh. P; *see* Dkt. No. 46 at pp. 20-21).  In contrast to a vandal lock, which as

reflected by the query and Defendants' own design, may be manually locked (and unlocked) by

anyone inside the bus, the type of in-motion lock Plaintiffs propose would automatically engage

so as to prevent the manual unlocking of the exit by any person when the bus reaches a certain

speed.  *See* (Dkt. No. 46 at pp. 21-22; Dkt. No. 50 at p. 9).  Unlike the vandal lock inquires that

prompted the NHTSA opinion letters, the preemption inquiry here demands consideration of

S5.3.3.1's requirements that all emergency exit doors be capable of "manual release…by a single

person" and operate "without the use of remote controls or tools, and notwithstanding any failure

of the vehicle's power system," as well as the regulations' goal of facilitating egress in

emergencies.  (Dkt. No. 46 at pp. 21-23; Dkt. No. 50 at pp. 9-10).  Far from "confirming" that

Plaintiffs' proposed lock is not preempted, the NHTSA's opinion letters lack guidance on issues

necessary to resolve the relevant inquiry, and even provide support for Defendants' appeal to the

second form of conflict preemption.  That is, in opining that FMVSS 217 does not prevent

engagement of a vandal lock after the engine has started absent amendment of S5.2.3.3, the

NHTSA observed that it was unaware of "any safety need to commence such rulemaking" since

emergency exit doors "should not be locked" and in practice "remain unlocked" when buses are

operating.  (Dkt. No. 46 at at p. 23; Dkt. No. 49, Exh. E; Dkt. No. 50 at p. 10).  Since Plaintiffs'

proposed lock conflicts with the NHTSA's observation of what "should be"—an observation

consistent with the purpose of FMVSS 217—Plaintiffs cannot rely on the letters to escape

preemption.

**d.     Release vs. Lock**

With respect to Defendants' appeal to S5.3.3.1, Plaintiffs take the position that the provision poses no conflict since the release mechanism to which the subpart refers is separate from the lock mechanism proposed by Plaintiffs.  (Dkt. No. 49 at pp. 14-16).  To address this argument, the text of S5.3.3.1 bears repeating; it states that "[e]ach school bus emergency exit door shall allow manual release of the door by a single person, from both inside and outside the passenger compartment," and that "[t]he release mechanism shall operate without the use of remote controls or tools, and notwithstanding any failure of the vehicle's power system."  49 C.F.R. 571.217, S5.3.3.1.  In support of their argument, Plaintiffs combine two excerpts of the deposition testimony of Defendants' corporate representative, Labonte, as follows:

> Q.     So…when it talks about manual release of the door, that's talking about the latch, right?
> A.     That's correct.
> Q.     It's not talking about a lock.
> A.     Correct.
> ….
> Q.     So we're talking about…two different mechanisms here.  You talk about opening the door.  I'm talking about locking the door.
> A.     Right.  Okay.  I understand the difference of the remote opening or unlatching as oppose to the remote unlocking.

(Dkt. No. 49 at p. 14; Exh. B at pp. 225, 263).  Plaintiffs assert that through this testimony, Defendants "recognized the distinction between a release (latch) versus a lock," yet through their appeal to S5.3.3.1, are attempting "to conflate the release mechanism onto a lock."  (Dkt. No. 49 at pp. 14-15).  According to Plaintiffs, their own "safer alternative design" maintains the recognized distinction, as it is "an in-motion lock mechanism (for use during non-emergencies) separate from the manual latch (release) mechanism (for use during emergency accident or crash), applying any one of three levels of technological sophistication."  (*Id.*).  Plaintiffs submit that "[a]t no time does Plaintiffs' expert suggest a remote control for the manual release

mechanism"; rather, "one proffered level of the alternative design would predict an emergency and a pre-set speed to disengage the lock," which design "would not interfere with the manual exit door release (unlatching) during an emergency."  (*Id.* at pp. 15-16).

Although the release contemplated by S5.3.3.1 and the lock proposed by Plaintiffs may be distinct in concept, Defendants' reply argues, most succinctly, that "[t]he two are mutually exclusive" since "[a] locked door will not yield to a manual release" and "a door that releases manually is not locked."  (Dkt. No. 50 at p. 4).  In other words, it would be impossible for a single person to manually release the subject door if that same door has been automatically locked, and impossible to automatically lock a door that is capable of manual release, such that the perceived distinction constitutes an unavoidable conflict.  *See* (*id.* at pp. 2-5).  Plaintiffs suggest that the release and lock are compatible because the lock would not be engaged, or would disengage, any time the door needed to be manually released.  However, this argument fails for two main reasons.  First, since the lock proposed by Plaintiffs would automatically engage at a certain speed, the door would not be capable of manual release once the bus had achieved that speed.  (*Id.* at p. 4).  Plaintiffs would call this a "non-emergency" scenario in which the door should not be able to be released, but S5.3.3.1 itself makes no provision for this preference.  Second, a door capable of release only to the extent that an automatic lock has not engaged necessarily renders operation of the *release* contingent on "the use of remote controls or tools" and "the vehicle's power system," and therefore conflicts with S5.3.3.1.  (*Id.* at pp. 4-5).  Plaintiffs' attempted distinction is unavailing.

**e.    Second Form of Conflict Preemption**

Assuming that Plaintiffs' claims overcome the hurdle of impossibility preemption, they argue that their proposed locking mechanism "does not thwart the purpose or execution of

[FMVSS 217]," as "[t]here can be no reason for a quick release of an emergency exit door for egress onto a highway while moving."  (Dkt. No. 49 at pp. 16-17).  Plaintiffs take issue with Defendants' reliance on the NHTSA's 1992 publication of the final rule amending FMVSS 217, asserting that the agency's concern with enabling quick egress during emergencies led to its decision to require a variety of exit types, but gave no occasion for the agency to consider "any requirement to safeguard the rear emergency exit door by a locking mechanism…when the school bus is traveling at highway speeds under normal operations (with no emergency, no crash, and no accident)."  (*Id.* at p. 17).  "In fact, after the 1992 amendments, NHTSA published its [1999 opinion letter], again stating that [FMVSS 217] does not prohibit the installation of locking doors as long as the school bus cannot be started with the emergency door in the locked position."  (*Id.* at p. 18).

As Defendants point out, Plaintiffs fail to consider potential emergency scenarios that could both trigger and arise from the engagement of their proposed lock, such where the bus becomes trapped or overturned yet still registers a speed that triggers the lock, or where the locking mechanism itself becomes disabled in an accident and the lock remains engaged even after the bus has come to a stop.  *See* (Dkt. No. 50 at pp. 6-8).  To give yet another example, Defendants point to the following testimony of their corporate representative, Labonte:

> Q.  So, Mr. Labonte, what's your experience in regards to crashworthiness of buses in specific to the rear emergency exit door?
> A.  Well, I have been involved with the NTSB and crash investigations and fires.
> Q.  Specifically with the rear emergency exit door…, what else?
> A.  One was a fire of a school bus where the wheels were—the driver backed over a ditch and the driver continued to spin the tires and the bus caught on fire and he kept panicking to spin the wheels to try and get it out, and the bus was fully engulfed.  In our assessment, the emergency exits all functioned.
> Q.  Was he the only one on the bus?
> A.  No, there was one other child.
> Q.  And did someone perish?
> A.  Both perished.

….

Q.      So basically in that particular scenario you were looking to see if the emergency exit doors were functioning?

A.      That's correct, among fire investigation, yes.

Q.      So what does that have to do with an emergency exit door being locked while in motion?

A.      Since the wheels were spinning, then that would mean that the—if there was some way of sensing the vehicle moving through its wheels, then—and the emergency exits were locked, then they could not be used in that scenario.

(*Id.* at p. 7; Exh. R at pp. 104-05).  Although the NHTSA may not have discussed these precise scenarios when publishing its final rule, the 1992 amendments were intended to facilitate exit during any potential emergency—not only the ones discussed—and in Defendants' examples, would be thwarted by a locking mechanism that poses the danger of *preventing* exit.  *See* (Dkt. No. 50 at pp. 5-6, 8).  Also, for the reasons already discussed, the 1999 opinion letter addressing the application of S5.2.3.3 to the engagement of vandal locks did not consider the interplay between this provision—much less S5.3.3.1 or the regulations as a whole—and Plaintiffs' proposed locking system, and does not support Plaintiffs' position that their lock comports with the purpose of FMVSS 217.

**f.      *Estrada***

In its final argument, Plaintiffs' response opposes the extension of *Estrada* to this case, arguing that "no federal preemption was asserted and the Court did not make any effort to interpret [FMVSS 217]"; rather, the Fifth Circuit concluded that the plaintiffs' evidence failed to address or rebut the defense expert's interpretation of FMVSS 217, which the Court accepted as "obvious" without further explanation.  (Dkt. No. 49 at pp. 18-19).  Plaintiffs assert that in this case, their proffer of the NHTSA's opinion letters, and the "advances in safety technology" undergirding the automatic lock proposed by their expert, Berriman, raise the genuine issue of material fact absent in *Estrada*, and prevent summary judgment here.  (*Id.* at pp. 19-20; *see* Dkt.

No. 46, Exh. Q at p. 4).

The Court agrees with Plaintiffs that *Estrada* did not directly undertake the preemption inquiry at issue here, and does not carry the binding force urged by Defendants. *See* (Dkt. No. 50 at pp. 14-15). However, the Fifth Circuit's observation that an emergency exit door only has "utility" if "it can be opened while the bus is moving" is at least consistent with S.5.2.3.3's requirement that the engine only be allowed to start if emergency exits are unlocked, with S.5.3.3.1's requirement that all exits be capable of easy, manual release without reference to any dispensation of this requirement at certain speeds, and with the regulations' intended goal of facilitating exit in any emergency scenario. The NHTSA's opinion letters addressing S.2.3.3 in a different context, and the fact that advances have since been made that allow for the automatic locking of bus emergency exits at designated speeds, do not call into genuine question whether Plaintiffs' proposed automatic lock conflicts with the currently existing regulations or their intent.

**g.     Plaintiffs' Motions for Leave to Supplement Summary Judgment Briefing and Evidence, and Defendants' Responsive Motions to Strike**

In Plaintiffs' Motion for Leave to submit a surreply with the attached supplemental report of their expert, Berriman, nearly a month after Defendants' reply, and in their recent Motion for Leave to supplement that surreply with argument relying on the attached deposition testimony of Defendants' "regulations expert," Bonanti, more than four months after the summary judgment briefing had closed, Plaintiffs attempt to provide more details on how the automatic lock would operate so as to preclude engagement in the potential emergency scenarios suggested by Defendants (Berriman's supplemental report), and to demonstrate that additional language in S5.3.3.1 renders this subpart inapplicable when the bus is moving at highway speed (Bonanti's testimony). *See* (Dkt. Nos. 51, 72). In response, Defendants filed their Motions to Strike the

supplemental briefing and evidence as both untimely and futile.  (Dkt. Nos. 52, 75).

Although the Court is generally inclined to allow supplementation in favor of resolving a motion for summary judgment on its merits, Defendants' arguments that Plaintiffs fail to provide "substantial justification" for the late submission of new information provided by Berriman's supplemental report, and seek to "backdoor" yet another previously undisclosed opinion by Berriman during his deposition by grafting it onto the testimony of Bonanti, provide convincing basis for departing from the Court's preference where, as here, the "endless, piecemeal approach to summary judgment briefing" has done more to impede timely resolution, than to further it. (Dkt. No. 52 at pp. 3-4; Dkt. No. 75 at pp. 5-6); *see* FED. R. CIV. P. 37(c)(1).  In any event, even were the Court to consider the supplements as competent summary judgment argument and evidence, it agrees with Defendants that they pose no barrier to preemption.   Berriman's supplemental report provides previously undisclosed information on how the proposed locking mechanism would function, and in relevant part, states that his proposed safer design "does not use the speedometer, engine speed or wheel speed of the bus," and that this design

> [w]ould *not* render the manual release functionally inoperative in emergency-type scenarios when the rear emergency rear exit door is intended to be utilized.  This design would only lock the door when conditions are met. These two conditions could be power applied to speed sensors and freeway speed information available.  If no power or no freeway speed [is] detected, the result would be never lock.  If power and freeway speed is detected the result would be lock.  The frequency at which freeway speed is checked for can be determined by the complexity chosen.  Any loss of power would have a mechanical default of unlock.  In this very simple version just these two parameters make [this] a safer alternative. If at any point this design loses power or the ability to determine freeway speed, the door goes to the unlock state.

(Dkt. No. 51, Exh. A) (emphasis in original).  As Defendants point out, even accepting the feasibility and functionality of Berriman's proposed safer design, nothing in the language of S5.3.3.1 to which Defendants' Motion for Summary Judgment appeals—the requirement that emergency exit doors operate by single-person, manual release independent of any remote

controls, tools, or power system—"limits this requirement to periods when the bus is traveling at a particular speed or when the bus is not in a so-called 'emergency-type scenario[.]'"  (Dkt. No. 52 at pp. 4-5).  Also, by admitting that his proposed design "depends upon a separate power source and 'speed sensors' to collect 'freeway speed information,'" Berriman confirms that this design renders the required manual release necessarily contingent upon remote controls, tools, and/or power systems, regardless of whether the lock interacts directly with the release, "because, again, a door that is 'locked' in any manner will not yield to manual release."  (*Id.* at p. 5).

Plaintiffs' reliance on Bonanti's testimony represents their final effort to contest the validity of these arguments, this time by advancing the new argument that separate language in S5.3.3.1 renders the subpart's manual release requirements inapplicable when the bus is moving at highway speed.  (Dkt. No. 72, Exh. 1).[11]  As no party has yet addressed, S5.3.3.1 begins by stating, "When tested under the conditions of S6…," the release shall operate in the manner specified.  *See* 49 C.F.R. § 571.217, S5.3.3.1.  In relevant part, Plaintiffs point to excerpts of Bonanti's testimony in which he agrees with Plaintiffs' counsel that the language of the regulations is clear and unambiguous, and then to his explanation that "the conditions of S6" refer to "test conditions, which would be the physical nature of the environment around the…test protocol," and which do not require that the bus be operating at highway speed.  (Dkt. No. 72, Exh. 1 at p. 3; Exh. H at pp. 3, 107-12, 114).  Plaintiffs make the logical leap that this testimony "confirms" that the release requirements of S5.3.3.1 do not apply when the bus is moving at highway speed, such that Berriman's proposed lock, which "would be defaulted to

---

[11]  To a lesser degree, Plaintiffs also rely on Bonanti's testimony as support for their position that an in-motion lock that engages after the engine has started does not conflict with S.5.2.3.3, but Bonanti testified only that the language of this subpart is clear and lacks ambiguity, not that Plaintiffs' proposed lock is consistent with that language.  *See* (Dkt. No. 72, Exh. 1 at p. 4; Exh. H at pp. 107-08).

unlock…when the bus is stationary for compliance testing" and would engage only at certain speeds, complies with this subpart.  (Dkt. No. 72, Exh. 1 at pp. 2-4).  However, as Defendants point out, Bonanti did not adopt this opinion; rather, it was Plaintiffs' engineering expert Berriman who, in his deposition predating that of Bonanti, opined that "because, at the very first line [of S.5.3.3.1], it's tested under the conditions of S6, …I didn't see anything in S6 that would cause the [proposed in-motion locking] system to fail this test."  (Dkt. No. 75 at p. 5; Exh. B at p. 274).  Notwithstanding that Berriman did not offer this opinion in his initial or supplemental reports—unsurprisingly, since in his deposition, Berriman agreed that his expertise does not extend to regulatory interpretation—the opinion lacks merit.  *See* (Dkt. No. 75 at pp. 5-6; Exh. B at p. 216).  Among the S6 test conditions to which S5.3.3.1 refers, as set forth in S6 itself, are that "[t]he vehicle is on a flat, horizontal surface," and that "[t]he inside of the vehicle and the outside environment are kept at any temperature from 70° to 85° Fahrenheit for 4 hours immediately preceding the tests, and during the tests."  49 C.F.R. § 571.217, S6.  In other words, the S6 test conditions encompass controlled settings at which the bus is tested for compliance with S5.3.3.1 before it is placed into use, not settings which must be present for S5.3.3.1 to apply.  *See* (Dkt. No. 75 at p. 7).  As Defendants point out, to hold otherwise would be to allow the subject exit to remain locked *any* time the bus is operational, including in emergency situations, thereby rendering the release requirements themselves meaningless, and contravening the regulations' goal of facilitating egress in emergencies.  (*Id.* at pp. 7-8).  Plaintiffs cannot rely on the prefatory language of the release requirements to avoid preemption.

**h.    Summary**

Even accepting that the language of S5.2.3.3 allows for implementation of Plaintiffs' proposed in-motion locking mechanism, the Court agrees with Defendants that S.5.3.3.1 does

not, and that the proposed lock also risks impeding the regulatory goal of facilitating exit during emergencies. Although Plaintiffs' proposed design may well have been safer for Gabriel, Jr. (as well as the student in *Estrada*), it conflicts with FMVSS 217 as currently written and with the aims of the 1992 amendments to this standard, leaving the agency (rather than this Court) with the prerogative to consider whether to remove this conflict in service of a different goal. Under the present regulatory scheme, Plaintiffs' claims are subject to both forms of conflict preemption, and summary judgment must be granted on these claims.

## V.    Conclusion

For the foregoing reasons, the Court hereby **ORDERS** that Defendants' Motion for Summary Judgment is **GRANTED**, and all other Motions considered herein or otherwise pending are **DENIED** without prejudice as moot. The Court will enter a separate, final judgment consistent with this Order.

SO ORDERED this 15th day of December, 2020, at McAllen, Texas.

Randy Crane
United States District Judge